52 CCPA
**Application of Marcel LEVECQUE and Paul Piot.**

**Patent Appeal No. 7331.**

United States Court of Customs and Patent Appeals.

March 4, 1965.

Rehearing Denied April 8, 1965.

John L. Seymour, New York City, for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

Levecque and Piot appeal from a decision of the Board of Appeals affirming the examiner's rejection of claims 16 to 23 of their application [1] for a patent on a method and apparatus for the manufacture of mats, more fully described in the application as "sheets, plaques, or mats from fibers of thermoplastic material, particularly fibers of mineral material." No claims were allowed.

Claims 16, 17, 18, 22 and 23 are directed to processes, while claims 19, 20 and 21 are directed to the apparatus. Claims 16 and 19 are illustrative:

"16. A method of forming mats, plaques, and sheets from thermally self-bonding fibers, especially mineral fibers such as glass, which comprises forming a loose, thick starting mattress of said fibers laid at random, heating the opposite faces of said mattress to temperatures which collapse the mattress and join the fibers at their points of contact, calendering the collapsed mattress at a speed which subjects the mattress to longitudinal tension, cooling the mattress, and subjecting the mattress to longitudinal tension as it is being cooled.

"19. Apparatus for forming thermally self-bonding mats comprising an elongated heating tunnel, means to support a mattress of random laid fibers in the tunnel so that both sides are exposed, means to heat both sides of the mattress to bonding temperature, calender rolls, means to drive them so as to put the hot mattress under longitudinal tension, coolers beyond the calender rolls, and means to put the calendered mat under tension as it issues from the calenders."

1. Serial No. 771,404 filed November 3, 1958.

The drawing reproduced below is further illustrative of the claimed invention:

The material or fibers are laid down at random in a loose thick mattress 4. Rollers 3 and 3a (motor driven) carry the mattress through a tunnel furnace 1. Elements 2 and 2a above and below the conveyor apply heat causing the fibers to slump or collapse in the direction of its thickness. Motor actuated rolls 5 and 5a function as calendering means on the fiber passing therebetween to smooth and compact same. The rolls are driven at such a speed as to apply tension to the sheet to prevent its shrinkage longitudinally. Cooling chambers 7 and 7a serve to cool the sheet as its passage proceeds therebetween. The sheet is then engaged between rolls 8 and 8a which are operated so as to apply tension to the sheet. Tension is adjustable through manipulation of elements 6.

The references are:

Thomas   2,016,401   October 8, 1935
Powers   2,518,997   August 15, 1950

Thomas discloses a method and apparatus for treating glass wool. A wool mat is formed by a blower depositing same on an inclined carrier, thence by the carrier to a vertical chute for deposit on an open work belt. As the wool passes beyond the chute, it passes beneath a motor driven roll which serves to compress and compact the material, so that a blanket of wool of predetermined thickness and density is laid on the conveyor, wherefrom the wool is conveyed into a heating chamber where heat is applied to the sheet by hot air passing from a furnace through the sheet and into exhaust pipes. The chamber may be heated electrically. As the wool passes through the heat chamber, it is brought to a softened or plastic condition and to a more compact and dense form in which the fibers are fused together. The caked wool then passes through an "annealing leer" before it has cooled.

Powers relates to a process and apparatus for producing porous mats from mineral wool such as glass and rock wool. The fibers, "though necessarily somewhat criss-crossed, * * * are arranged generally lengthwise of the strip," and are laid down in a horizontal blanket which is drawn vertically through a heating chamber by opposed rollers. Heat is applied to both sides of the blanket by hot air from burners and by electrical heating elements. "The hot gases penetrate the wool, and * * * heat is radiated directly into the sides of the blanket by the electrical units * * *. During its passage through the heating chamber, the wool in the blanket is softened and the thickness of the blanket reduced from 2½ inches to about 1 inch "by heat, cohesion and tension." The rolls impart the final thickness "between the ribs of about 0.04 inch to 0.08 inch." The wool passes through guide plates to a suitable cutting means. Cooling pipes are provided in the heating chamber to prevent excessive heating of the edges of the blanket.

The examiner found all claims unpatentable over the combined disclosures of Powers and Thomas. The board affirmed this holding and further found the apparatus claims unpatentable over Powers alone. In holding claim 16 unpatentable, the examiner noted that the Powers blanket of mineral fibers is heated on opposite sides. The heat softening of the fibers would produce some collapse of the blanket and the fibers are joined at the points of contact as called for by the claim. The examiner further noted that the rolls of Powers served as calendering rolls and applied tension to the collapsed blanket and that the rolls operated at a lower temperature than the furnace temperature and to that extent would function as coolers. The examiner, noting that the annealing leer of Thomas was "definitely a cooling zone," considered that it would be obvious in view of the teachings of Thomas to add a leer to the Powers apparatus if such be deemed desirable. As for the final step of applying tension to the mat while cooling, not shown in either reference, it was pointed out that the specification ascribed no critical function to the step and that its purpose was apparently merely to prevent

accumulation of the mattress, and therefore of no patentable significance.

Appellants place strong emphasis on the word "collapse" as used in the claims, contending that the tribunals below broadened the specific word to give it a general connotation, thus stripping the claims of their limiting terms. As hereinabove noted, Powers specifically states that the thickness of his blanket is reduced in the heating chamber from about 2½ inches to about one inch by "heat, cohesion and tension." Appellants rely on Webster's New International Dictionary (2d ed. 1934)[2] to sustain the construction which they contend for the word "collapse."

Powers clearly teaches that his blanket does "fall into a flattened shape" and that it is "reduced to a more compact form" by its reduction in thickness from 2½ inches to one inch. Appellants' position is not sustained by the definition of "collapse" upon which they rely. In view of "collapse" as defined, we are not persuaded by appellants' argument that collapse could not take place in a vertically moving blanket or under the impact of tension forces as shown in Powers. In addition, it is pertinent to point out here that in appellants' brief submitted to the board, it is admitted that Thomas discloses that his blanket undergoes a collapse.

Appellants contend that Powers does not show his fibers laid at random. As pointed out in our analysis of the Powers' reference, it is disclosed that the fibers are "criss-crossed" and that they are only "generally" lengthwise of the strip.

The obvious purpose of random or criss-cross laying of fibers in appellants' process as well as in the Powers' process is to increase the number of junctions, thus to enhance the strength of the mat. The vertical bin and the conveyor of Thomas clearly show the fibers introduced to the conveyor in a random manner. If Powers be deficient in this respect, then Thomas clearly suggests the remedy.

In their specification appellants refer to their pinch rolls 8, 8a as "preferably driven" so as to apply a certain degree of tension to the cooled mat. No purpose is set forth for this step. Appellants in their brief denominate this step as "cold drawing." Neither this phrase nor its synonym is to be found either in the specification or claims, nor do we find any suggestion that it in anywise affects the final product. The examiner noted that apparently this step served to prevent accumulation of the mattress in this zone or to prevent contact with the cooling members. If there should be need for such a step to prevent buckling of the moving mattress either in the Powers or Thomas process, the need of itself would suggest the obvious remedy of a simple discharge assisting step.

The essential difference between claim 17 and claim 16 is that the former provides that the mattress move "horizontally into a heating zone" and that edges be "heated to a lesser degree than the central portion." Powers provides coolers to prevent excessive heating of the edges. Thomas shows movement of the blanket horizontally to and through the heating zone. It would seem clearly obvious to combine this step with the heating and calendering steps of Powers.

Claims 18, 22 and 23 include limitations to the application of heat to the mattress at stated and successive different rates.[3] These limitations are not

---

2. collapse—1. To fall or shrink together abruptly, as the sides of a hollow vessel; *to cave in; to fall into a flattened*, wrecked, distorted, or disorganized *state;* often, with the idea of design; to fall into, or to be *reduced to, a more compact form*, as for convenience in transportation; as, boats made to collapse for ready portage. 2. To break down or fail abruptly and utterly; to go to pieces; as, his health and plans collapsed together. (Emphasis added.)

3. The claim states that the mat "is initially subjected to about 34000 kg cal h/m², is thereafter subjected to about

disclosed in Powers or Thomas. The examiner pointed out that the duration of the heating in each amount is entirely absent, reasoning that intense heat for a very short time would have an entirely different effect on glass fibers from the same heat for a longer time and that the nature of the glass used would materially alter the results and that the recited conditions constitute merely a matter of choice and differ from those of the references merely in degree.

We are inclined to agree with the reasoning advanced by the examiner. There is no reference in the claims as to the length of time each rate of heating is applied. The rate of heat application conveys little or no meaning without indication of the various periods of time that the rates are in effect and the specification contains no indication of the significance of the rates.

As we have noted, the apparatus claims 19, 20 and 21 were rejected by the examiner as unpatentable over Powers in view of Thomas, while the board deemed Powers alone sufficient upon which to predicate a rejection. The board found that:

> "Rolls 22 and 23 of Powers provide means to support the mattress and also serve as means to place the hot material under longitudinal tension. Coolers beyond the calender rolls, as claimed, read on atmospheric cooling of Powers, and * * it would be obvious to provide pulling means to remove the product from the furnace. Dependent claim 20 adds no structure to claim 19 and the heating means with a plurality of controllable sections of dependent claim 21 is found in Powers * * *."

Appellants contend that the rolls in Powers are not calendering rolls. The solicitor cites Webster's New International Dictionary (3d ed. 1961), defining "calender" as

"to press (as cloth, rubber, paper) between rollers or plates in order to make smooth and glossy or glazed or to thin into sheets—."

There can be little doubt that the rolls of Powers "thin into sheets" the mattress as it passes therebetween.

The space above the plates exposes the mat to atmospheric cooling. Thomas cooled by providing an "annealing leer." While appellants contend that an annealing leer does not cool, Webster's New International Dictionary (3d ed. 1961) defines the word "anneal" as follows:

> "2a: to heat and then cool usu. for softening and rendering less brittle, gradual cooling being required for some materials (as steel and glass) * * * b: to process (structural-clay products) by slow cooling after subjection to heat in order to prevent checking, cracking, and warping * * * brick
>
> "3: STRENGTHEN, TOUGHEN * * *"

It would seem, therefore, that annealing includes cooling in a controlled manner and that it would follow that an annealing leer is a cooler as well as a heater.

Claim 20, dependent on claim 19, states that "the heating means is concentrated inward of the edges of the mat." This limitation would seem to be met by the structure of coolers in Powers to absorb or reduce the heat near the edges of the mat.

Claim 21 adds the limitation of "a plurality of controllable sections aligned with the length of the mat." Powers describes "sections of refractory supported * * * heating elements" and "exact control of the temperature inside the furnace," thus indicating anticipation of this feature of claim 21.

After due consideration of the arguments advanced by appellant and for the reasons stated, we find no reversible

42000 kg cal h/m², is thereafter subjected to 3000 kg cal h/m² * * *." Although the units specified are unfamiliar to us, we will accept the appellants' and examiner's determination that they specify a rate of heating.

error in the decision of the board holding the claims in issue unpatentable over the Powers and Thomas disclosures.

The decision of the board is affirmed.

Affirmed.